ALLEN, Collector of Internal Revenue, v.
TRUST CO. OF GEORGIA et al.

No. 11160.

Circuit Court of Appeals, Fifth Circuit.

May 3, 1945.

Carlton Fox, Sewall Key, Mills Kitchen, and Helen R. Carloss, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and Chas. W. Walker, Asst. U. S. Atty., of Macon, Ga., for appellant.

John A. Sibley and Furman Smith, both of Atlanta, Ga., for appellee.

Before WALLER and LEE, Circuit Judges, and LONG, District Judge.

WALLER, Circuit Judge.

When the settlor, Jack J. Spalding, in 1937, at the age of eighty-one and within two years of his death, relinquished the power to amend, change, enlarge, or limit the terms of two trust agreements, made in 1925, irrevocably conveying securities in one instrument to a trustee for his daughter and in the other for one of his sons, was such relinquishment made "in contemplation of death" under Sec. 302, subsections (d) (1) and (d) (3), Revenue Act of 1926, as amended by Sec. 401, Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 229, now Sec. 811(d) of Title 26 U.S.C.A. Int.Rev.Code.[1]

In 1925 Mr. Spalding, being a man of considerable means, active, and in good health, discovered that his daughter, Suzanne (Mrs. Schroeder), her husband, and their five children were in impecunious circumstances due to serious financial reverses. They were living in a small garage apartment in Miami where they had gone after the oil mill venture of Mr. and Mrs. Schroeder in Albany, Georgia, had been wrecked by the cancellation of contracts, and the catastrophic fall in prices consequent upon the cessation of hostilities of World War I. The settlor's son, Jack, had also engaged in unwise and improvident business ventures, with the result that he was in hard financial circumstances. To relieve their situations Mr. Spalding created two trusts, of the type usually referred to as "spendthrift trusts", wherein he sought to protect these two children and their children from privation and want, as well as from the results of any repetition of their previous business misadventures. In each of the two trust agreements, which were between him and a trust company, as trustee, he irrevocably conveyed to the trustee corporate stock then having a value of $50,000.00. In 1934 he increased these two trusts by additional gifts of personal property of the value of $50,000.00.

There is not, and there could hardly be, any serious dispute that these two trusts, established in 1925 and increased in 1934, were: (a) to protect the children against want and against their own business mistakes; (b) executed with the intention on the part of their father to make the gifts absolute; and (c) not executed, either in 1925 or 1934, in contemplation of death, either in the actual sense of one who looks over Jordan and sees the sweet chariot swinging low and a band of angels coming after him, or in the synthetic or presumptive sense. The lower Court so found with abundant evidence to support the finding.

But the 1925 trust agreements contained the following provision, which was also brought forward in the 1934 amendment: "During my life, by the unanimous consent of the said trustee, my said daughter and of myself, the terms of this agreement may be amended, changed, enlarged or limited, but in no event shall the conveyance of

---

[1] Sec. 302(d) (1) "To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * *

"(3) The relinquishment of any such power, not admitted or shown to have been in contemplation of the decedent's death, made within two years prior to his death without such a consideration and affecting the interest or interests (whether arising from one or more transfers or the creation of one or more trusts) of any one beneficiary of a value or aggregate value, at the time of such death, in excess of $5,000, then, to the extent of such excess, such relinquishment or relinquishments shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

said stock to the party of the second part be revoked."

The state of the law was such that at the time of the trust agreements the language of sub-paragraph (d) (1) of Sec. 302 relating to a reservation of a power of amendment "either by the decedent alone or in conjunction with any person" was thought to reach situations only where the decedent or trustee or some other person not adversely interested might, by amendment, reduce, or take away from the cestui que trust, the right to the enjoyment of the property of the trust estate.[2] But the law was not that of the Medes and Persians which altereth not, and in Helvering, Commissioner v. City Bank, 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62, it was held that the term "in conjunction with any person" should be construed to mean *any* person and that the term included the beneficiary or persons having an adverse interest, regardless of the veto power of the beneficiary in the trust agreement. That decision, rendered November 11, 1935, was called to the attention of Mr. Spalding, Sr., in May, 1937, by his son Hughes, who was an attorney in the settlor's law firm.

Thereupon the elder Spalding relinquished the power to change, alter, or modify[3] the trust indenture, but Mr. Spalding died within two years of the date of making the relinquishment, causing the statutory presumption of Sec. 302(d) (3) to arise that the relinquishment was made in contemplation of death.

The tax is "upon the *transfer* of the net estate of every decedent" and not upon the net estate, the value of the transfer being measured, of course, by the net value of the estate passing from the decedent to his heirs, devisees, or legatees. Secs. 302(d) (1) and 302(d) (3) of the Act also undertake to prescribe certain tests in determining the gross estate of a decedent. For instance, Sec. 302(d) (1) provides, in substance, that any interest of the estate of the decedent of which he has theretofore made a transfer, by trust or otherwise, where the *enjoyment of such interest* at the time of his death was subject to any power of the decedent, either alone or in conjunction with any other person, to alter, amend, or revoke the transfer or trust, or where the decedent relinquished such power to alter, amend, or revoke in contemplation of his death, shall be included in the gross estate of the decedent.

Sec. 302(d) (3) provides that the relinquishment of any such power, made without consideration and within two years prior to his death, which affects the interest of a transferee or beneficiary of a value at the time of death in excess of $5,000, shall, to the extent of such excess, be deemed to have been made in contemplation of death within the meaning of the Act unless the contrary be shown.

So when Mr. Spalding died within two years from the date of the relinquishment of the power to amend, which could only be done upon the unanimous consent of his daughter, the trustee, and himself, the Commissioner of Internal Revenue, invoking the above-mentioned subsections, required the inclusion in the gross estate of the decedent the amount of the interest which the decedent had theretofore irrevocably transferred to the trusts for the benefit of his son and daughter and their children.

The trustee paid the tax under protest and successfully sued in the District Court of the Middle District of Georgia for the recovery of the tax so charged and collected.

After making the finding of facts shown in the margin,[4] the District Court then

---

[2] Reinecke, Collector v. Northern Trust Co., 278 U.S. 339, 49 S.Ct. 123, 73 L. Ed. 410, 66 A.L.R. 397.

[3] The language of the relinquishment was: "From and after this date said trust indenture as hereby modified shall not in any manner whatsoever or to any extent whatsoever be subject to any change, alteration or modification in any capacity, alone or in conjunction with other person or persons whatsoever."

[4] "7—The trusts established on June 15, 1925 and enlarged on August 26, 1934 in favor of Suzanne and Jack, Jr., and the gift to Hughes were made under the following circumstances: Prior to 1924, Suzanne had entered a partnership venture with her husband under the name of Albany Oil Company. That business, on account of losses in inventory values and the cancellation of contracts, by the Government, met with financial disaster in the 1920's, causing Suzanne to lose all of her investment, including her home, and leaving her liable jointly with her husband for bank debts in the sum of $80,000. In 1924, Mr. Spalding advanced $10,000 to get Suzanne relieved of the bank obligation. After this business misfortune, Suzanne's husband was with-

·concluded as a matter of law: (1) That an intent to avoid an estate tax, standing alone, is not conclusive that a gift or a release of a power was made in contemplation of death in the statutory sense; (2) That neither the original gifts nor the release of the power in this case was made in contemplation of death within the meaning of

out means to support his wife and their five children, Mr. Spalding's grandchildren. Jack had invested the funds his father had given him in a local enterprise which had been liquidated, and he and his family had moved to Mexico City. The remuneration from his work was insufficient to support his family, and Mr. Spalding gave him a monthly allowance. Prior to 1934, Mr. Spalding's oldest son Hughes had invested heavily in real estate and in the stock market, and because of losses and shrinkage in value brought about by the depression of 1929, which continued through the thirties, he became insolvent. Mr. Spalding gave his son $50,000 to help him out, and at the same time purchased from his son $90,000 of real estate which had originally cost $110,000, and applied the purchase money on his debts. It was the time that this gift was made to his son Hughes that Mr. Spalding added like amounts to the trusts in favor of Jack and Suzanne, except that Suzanne was given in fee simple title to the home in which she lived at the value of $19,000.

"8—The gifts of June 15, 1925 and August 26, 1934 were made by Mr. Spalding to meet the pressing necessities of some of his children and to equalize the gift to others and out of the desire to relieve the needs and to make secure the maintenance of his children and the education and support of his grandchildren. The gifts were put in trust and not delivered to the children because of past experience in handling prior gifts. Suzanne and Jack had lost such gifts in unsuccessful business enterprises, and Mr. Spalding, in establishing the trusts, desired to protect them against their own business misadventures and not to retain any benefit, directly or in...rectly, to himself.

"9—At the time the trusts were created in June, 1925 and enlarged in August, 1934, Mr. Spalding believed that the gifts were complete and absolute and so intended, and that the trust property passed absolutely out of him for all purposes, including estate taxes. Under the law as he then interpreted it, he was justified in that belief. He returned and paid gift tax upon the full value of the gifts in 1925 and 1934, and his intentions and purposes were to make the gifts absolute and complete.

"10—On or about April 27, 1937, upon being advised for the first time that under decision of Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S. Ct. 70, 80 L.Ed. 62 (decided some eighteen months after the gift of August 26, 1934) the gifts remained a part of Mr. Spalding's estate and would be included in his estate for estate tax purposes, Mr. Spalding on May 1, 1937 had prepared and executed an instrument renouncing the power reserved in said trust. When the trusts were created and enlarged by amendment, and on May 1, 1937, Mr. Spalding was in average good health for a man of his age.

"11—Upon the renunciation of the power in said deeds of trust on May 1, 1937, Mr. Spalding, neither then nor thereafter, made any other substantial gifts to his children, although at that time and at the time of his death he was worth approximately one million dollars. In fact, he made no substantial gifts to his children after 1934, although from 1920 until the time of his death he gave to the Church and to educational and other charitable institutions fully as much as the combined gifts to all of his children during his lifetime.

"12—Mr. Spalding made the releases of May 1, 1937 for the purposes of putting the trusts in the condition, which he had thought they were in when made, so that they would not be a part of his estate for estate tax purposes. However, in making such releases Mr. Spalding was actuated by the thought of death only to the extent that thoughtful men habitually act with regard to ultimate death, and he did not in 1925, 1934 and 1937 entertain thoughts of death except the general expectation of death that all entertain.

"13—He was motivated in making the gifts by his desire to meet the necessities of his children and to set aside property solely for the benefit of them and their families, freed of all claims, tax and otherwise, and the release of the power on May 1, 1937 falls within the scope of the purpose and motive he had in making the gifts in 1925 and 1934.

"14—Neither the creation of the trust in 1925 nor its enlargement by amendment in 1934 nor the renunciation of the power on May 1, 1937, was done or made in contemplation of death in the statutory sense."

the statute; and (3) That judgment should be entered for the recovery of the taxes paid.

All of the finding of facts from 7 through 13, inclusive, have substantial support in the evidence. Finding No. 14 to the effect that the renunciation of the power to amend, executed on May 1, 1937, "was not made in contemplation of death in the statutory sense", is supported by the circumstances and facts in evidence insofar as the actualities are concerned, but in view of the artificialities injected into the case a mixed question of law and fact is involved, which calls for further consideration and for some elaboration.

Much has been written as to what is meant by the phrase "in contemplation of death" in connection with: (a) The contemplation of death of one who is in extremis and who believes that death is imminent; (b) The general expectation of death that all men entertain; (c) The statutory contemplation of death attributable to all who die within two years after making certain gifts, or after relinquishing the powers relating to the management thereof. But now the Appellant urges that there is still another process by which one can think his estate into taxation if he, in making a gift, had in mind the saving of taxes to his heirs or legatees. It seems to be a sort of synthetic contemplation of death attributable to the man who, in the exercise of proper and legal motives, makes a gift or relinquishes a power which he hopes will have the consequence of freeing his estate from the payment of death taxes.

An explanation of the first two of the afore-mentioned types of contemplated dissolutions is hardly necessary because most of us have had contacts with the Grim Reaper, both proximate and remote, and have contemplated death in each of such aspects; but when it is asserted that a person acts in contemplation of death in the relinquishment of a power to alter a transfer previously made for the protection of his children and the equalization of his bounty merely because he wishes the transfer to have the tax consequences that he originally intended, to wit, the freedom from death taxes against his estate and his heirs, a novel concept is projected into the brain of the uninitiate. Perhaps some, to whom the idea seems bizarre, will better understand the development of this concept by considering the analogy of such a mental process to the mental process attributable to one making a will or a testamentary disposition of his property. It is deemed that the making of a will involves a contemplation of what will occur upon the testator's death, as well as the methods whereby his wishes and desires can be carried into effect after his death. So, then, it is not a far step of the taxgatherer from the recognized position that a man in making a testamentary disposition of his property does so in contemplation of death to the presently debatable position that the same thing would be true when a man undertakes by a gift or by the relinquishment of a power to avoid taxes that would otherwise occur upon his death. When the dominant motive of a donor in the relinquishment of such a power was to avoid taxes that would otherwise result upon his death, the Appellant insists that such donor was necessarily acting in contemplation of death, regardless of what may have been the prime purpose of an original gift or the state of health of the donor at the date of the making of such gift.

■ We will keep in mind that: (1) The estate tax is laid upon the *transfer of property* of the deceased which occurs upon his death, either by operation of law or by testamentary disposition; (2) The tax is laid only upon the property which the decedent owned at the time of his death or over which he then retained the power of control; (3) If a gift is made within two years of the death of the donor a presumption arises that it was made in contemplation of death; (4) If in any transfer, by trust or otherwise, the enjoyment is subject to a retained power by the donor, by himself or in conjunction with another, to alter, amend, or revoke, such a trust or transfer will be considered in the nature of a testamentary disposition; (5) If the donor relinquishes such power to amend, alter, or revoke the enjoyment of the gift within two years of his death, it will be presumed that such relinquishment was in the nature of a testamentary disposition and made in contemplation of death; (6) If any gift is made in contemplation of death it is in the nature of a testamentary disposition and subject to the estate tax.

■ It is settled that if anything essential to the full enjoyment of a gift or trust could not accrue to the donee until after the death of the donor, such a gift is testamentary in character. If it is testamentary in character, it is subject to the tax. In United States v. Wells, 283 U.S. 102, text

116, 51 S.Ct. 446, 451, 75 L.Ed. 867, the Court said:

"The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. *The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax.* Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Milliken v. United States [ante], 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 * * *. As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition." (Emphasis added.)

It seems that the only question in this case, in view of the finding of facts by the lower Court and their support by substantial evidence, are: (1) Whether or not the dominant purpose of Mr. Spalding in relinquishing the power to amend, alter, or revoke the terms of the trust agreement was to avoid estate taxes; and (2) If a desire to avoid estate taxes was the dominant motive of Mr. Spalding, would that necessitate the holding that the relinquishment was in the nature of a testamentary disposition and, therefore, in contemplation of death?

Mr. Spalding was a man in exceptionally good health for one of his age. The original gifts were not made in 1925 and in 1934 in contemplation of death, nor with the idea of avoiding inheritance taxes. They were spendthrift trusts, made for the benefit of the children of the donor who had been unsuccessful in the management of their own business. He had previously made gifts, from time to time, to his wife and children, and at the time the trusts were created outright gifts were also made to his wife and another son. However, he did not believe it to be for the best interest of the son Jack and the daughter Suzanne that they be then given the management of the properties which he proposed to transfer to them.

The numerous activities in which the decedent was engaged, his varied interests in civic and charitable enterprises, his view that the Government was right in attempting to prevent, by taxation, the perpetuation of inordinately large fortunes from generation to generation, and numerous other circumstances, all sustain the finding of the lower Court that the original gifts in 1925 and in 1934 were not testamentary dispositions, nor made in contemplation of death, nor with the idea of avoidance of death taxes. There is also ample evidence to support the finding of the lower Court that Mr. Spalding did not make the relinquishment in the contemplation that death was near at hand. But the motive in 1937 that actuated the decedent in making the relinquishment of the power to alter or amend the trust, the effect of that motive, and the meaning of the language used in the reservation of power to amend are the features around which a solution of this case devolves.

Mr. Spalding irrevocably transferred the securities to the trustee for his children. No right to amend, alter, or revoke that transfer, or conveyance, was reserved, as was the situation in Helvering v. City Bank, 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62.[5] The tax is upon the transfer of the property owned or controlled at death, but this property was transferred irrevocably many years before his death. The right of the enjoyment of the ownership in the corpus of each trust was not reserved to donor or

---

[5] In Helvering v. City Bank, 296 U.S. 85, 56 S.Ct. 70, 71, 80 L.Ed. 62, the statement of facts shows that:

"The trust was irrevocable save that the settlor reserved the right to modify, alter, or revoke it, in whole or in part, or to change any beneficial interest, * * *"

Under the facts there the Court stated (text, 296 U.S. at page 91, 56 S.Ct. 73, 80 L.Ed. 62):

"It is competent for Congress, in order to avoid the evasion of tax, to declare that when one has placed his property in trust *subject to a right of revocation* in himself and another who is not the beneficiary he shall, nevertheless, be deemed to control the property in such sense that the income therefrom shall be treated as his income for the levying of a tax." (Emphasis added.)

(In the instant case, however, there is no power to revoke the transfer of the stock or for the donor to recapture either the title or the enjoyment thereof.)

subject to change or revocation in any way whatsoever. The instruments themselves, as well as the facts and circumstances, show that it was the intent and purpose of the trustor to completely pass the ownership of the corpora from himself to the trustee of his children. He had made a complete gift of the stock. What he reserved was the right to "amend, change, enlarge, or limit the terms" of the trust agreement upon the unanimous consent of the beneficiary, the trustee, and the settlor. The transfer of the stock was complete when made and there was nothing akin to a testamentary disposition in its transfer. The tax is upon the transfer of property, and the property transferred here was in no wise subject to alteration or amendment as to the corpus of either trust.

In the brief for the Government there is this forthright statement: "* * * the decedent had created the trusts aforesaid, with spendthrift provisions, in order to meet the pressing necessities of his daughter and son Jack and to protect them against their own business misadventures and not to retain any benefit, directly or indirectly in himself, his intentions and purposes being to make the gifts absolute and complete."

Since the gifts of the securities were absolute and could not be revoked, it would seem that the donor's status with respect to the trusts after their creation was somewhat that of a co-administrator with powers retained in the trusts that could be exercised only in behalf of the estates, and whose acts were only as a representative of the estates, from which no benefit; directly or indirectly, could flow to the donor.

The brief for the Government also contains the further admission: "It is well settled that the purpose of the statute is to prevent the evasion of the estate tax by devices, * * * commonly referred to as substitutes for testamentary dispositions, motivated by death purposes; * * *" but in view of the fact that the gifts of the securities in 1925 and in 1934 were absolute and irrevocable, and that no property right was relinquished in 1937 or transferred upon Mr. Spalding's death in December, 1938, there seems to be no actual or factual basis for the contention that the relinquishment in question was a substitute for a testamentary disposition. The right surrendered added nothing to the title of the trustee and transferred nothing out of the decedent's estate.

When, however, the settlor became apprised of the fact that the retention of the right to amend the terms by which a trust would be managed, or by which the income from the property might be enjoyed, might result in encumbering or burdening the cestui que trustent or the corpora by rendering them liable to a tax (as in the case of the retention of the right to revoke the *enjoyment of a transfer*), and that his gifts had not been as complete as he had intended, he set about promptly to free the property from the encumbrance or burden of a tax liability. That is no death purpose.

■■ Appellant says, though, that if the relinquishor has the purpose of avoiding taxes at death, he has death on his mind, and such relinquishment is a testamentary disposition. The argument ignores the fact that a man has a right to take any lawful steps, or to make a relinquishment of such a power, in order to save taxes.[6] The only consequence from the relinquishment of such a power is that if it is relinquished at a time that the relinquishor deems death to be near at hand it will be held to have been a testamentary disposition. For if the donor makes a gift but retains the use or enjoyment, or the right to the use and enjoyment, until his death, the Collector could rightly inquire of such donor, "Wouldst thou both eat thy cake and have it?" A gift in life with the right of revocation, or the right of enjoyment reserved in the donor is not such a transfer as will take the corpus of the gift out of donor's estate for estate tax purposes at death. But an irrevocable, or absolute gift not made in contemplation of death, is not taxable despite the fact that incidental benefit in the avoidance of estate taxes will result on the death of the donor. Every gift has that incidence.

■ Moreover, in view of the right and privilege of the taxpayer, often declared by the Courts and long recognized by the Congress, to decrease the amount of his

---

6 In the case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, it was said: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 396, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217."

taxes or to avoid them altogether by means which the law permits, the mere making of a gift more complete by freeing it from estate taxes that otherwise would accrue upon the donor's death will not be construed as the equivalent of a testamentary disposition in the absence of proof that the relinquishor considered that death was near at hand.

The Appellant would have us: (1) To presume that Mr. Spalding's motive in making the relinquishment was solely or dominantly for the purpose of avoiding estate taxes. (2) Having accepted the first presumption, he would have us then presume that the relinquishment was a testamentary disposition. (3) Then, after accepting presumptions (1) and (2), he would have us lastly presume that the relinquishment was in contemplation of death.

It is only by the pyramiding of these several presumptions that the conclusion which the Collector seeks can be reached. Pyramiding of presumptions is not permissible under the holding of this Court in Standard Accident Ins. Co. v. Nicholas, 146 F.2d 376.

The judgment is affirmed.