The **COLORADO NATIONAL BANK OF DENVER**, as Executor of the Estate of Gertrude H. Cuthbert, Deceased, Plaintiff,

v.

Ralph **NICHOLAS**, U. S. Collector of Internal Revenue for the District of Colorado, Defendant.

**Civ. A. No. 3514.**

United States District Court,
D. Colorado.

Dec. 29, 1954.

Grant, Shafroth & Toll, Morrison Shafroth and Erl H. Ellis, Denver, Colo., for plaintiff.

Donald E. Kelley, U. S. Atty., for District of Colorado, Denver, Colo., Clifford C. Chittim, Asst. U. S. Atty., Boulder, Colo., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, James P. Garland, Sp. Assts. to the Atty. Gen., for defendant.

KNOUS, Chief Judge.

The plaintiff herein seeks to recover $166,109.45, with interest, representing a portion of the Federal estate taxes paid by the decedent's estate.

The sole question presented is whether the Commissioner of Internal Revenue erred in including in the decedent's taxable estate the value of the personal property embraced in trusts made by the decedent for the benefit of her three daughters on November 16, 1935, as being "transfers in contemplation of death" within the meaning of section 811(c), Title 26 U.S.C.A.

All of the authorities in this field agree that the question of whether a donor's dominant motive is associated with life rather than with the distribution of property in contemplation of death is a question of fact in each case.

The evidence shows that the decedent had been twice married, first to Charles Berger who died in 1891, and later to Lucius M. Cuthbert, who passed away in 1915. The elder of decedent's three daughters, Charlotte Berger Barbour, was born as issue of the first marriage, and the two others, Gertrude Cuthbert Wheelwright and Alice Cuthbert Pierce, presently Doles, were children of the second marriage. The decedent, a woman of wealth, was well educated and well read. She was a confirmed world traveler from as early as the mid-twenties until the outbreak of World War II which caught her in Germany, obliging her to escape through Denmark to the United States in a refugee ship in 1939. Beside regular trips to England, the European continent and South America, she made long journeys through and into the more inaccessible areas of the world, such as the hills of Burma and the overland route from Capetown to Cairo in Africa, and explored portions of New Zealand on foot. As a result of her travels she held the title of a Fellow of the Royal Geographical Society. Consistent with the adventurous life she chose, the evidence portrays her as an outspoken woman of strong feelings and actions.

It is clear from the evidence that from the time of their birth to the date of the creation of the 1935 irrevocable trusts, the needs of her daughters were judged by the decedent under her own standards and ideas. In the pattern of her own life, the girls were brought up and maintained in an atmosphere of luxury during their childhood days and periods of education which was provided by instruction from governesses rather than in the public schools culminated by their attendance in exclusive eastern and continental private schools. Financial support from the decedent in the form of substantial gifts and regular monthly allowances continued after the respective marriages of the daughters with the obvious purpose on the part of the decedent to enable them to live according to a certain standard despite the fact that their spouses were not able to support their families on that basis.

In the beginning, decedent's contributions to her daughters generally were in the form of periodic gifts in such amount as the decedent deemed appropriate in the circumstances. Thus, in 1921, decedent gave Charlotte $60,000 for the purchase of a home and its establishment, and in 1930 substantially increased the monthly allowance to Gertrude when her first child was born. As the married lives of the daughters became more stabilized, the decedent's gifts to them more and more began to assume the form of monthly remittances in varying amounts as the decedent deemed proper.

After decedent's decision, following the death of Mr. Cuthbert, to choose for her own life residence and travel abroad, it would seem that she became more inclined to express her unquestioned love and affection for her daughters by gifts of money and her semiannual visits rather than by the devotion of the bulk of her time to living with or near them as had been her previous course. As a result of the extended periods of her residence abroad, she in 1921 invoked the aid of her brother-in-law and banker, William Berger of Denver, Colorado, in handling her affairs. Until his death,

Mr. Berger, as a personal matter, made her investments, collected her income and deposited the same in an account in his bank from which he made remittance to the children and decedent as directed by her. This arrangement terminated when Mr. Berger died in 1931, and on August 4 of that year decedent created what will hereinafter be referred to as the 1931 revocable trust consisting of securities in excess of one million dollars. Under its terms she was to receive the income for life with the provision that upon her death the corpus should go to her heirs and legal representatives. Decedent also reserved the right to "direct" or "approve" all trust investments. This trust remained in effect until decedent's death. On the day of the execution of that trust she addressed a letter to the trustees and George V. Berger, another of her brothers-in-law, and the Colorado National Bank, directing them to pay from income of the trust to her three daughters the following monthly amounts: Mrs. Charlotte Berger Barbour, $350, Mrs. Gertrude Cuthbert Wheelwright, $550 and Mrs. Alice Cuthbert Pierce (now Doles), $550. At this time the girls were all married, and had inherited a considerable sum of money from an aunt, while their respective husbands were building up more earning power. Charlotte, as a witness, accounted for the lesser amount of her allowance on the basis that, at the time, she was a "little more prosperous than the other two." The last mentioned payments were made regularly to the children until the November 16, 1935, irrevocable trust, here in concern, became effective.

Matters progressed so until 1935, when on August 23 of that year the decedent, then in Europe, wrote to George Berger, her banker and brother-in-law, the letter around which the Government primarily builds its case, which reads as follows:

"My dear George—

"Thank you so much for your letter, dated August 8th, which came this morning! You have made it all clear to me. I knew it was a matter of book-keeping, and you must think I am very stupid, which I am.

"In the course of time, I would like an opinion from you, or from one of the Trust officers, as to how and where and how much I am likely to be 'stunk' by the new soak-the-rich taxes—In some way it *must* be circumvented that my allowances to my 3 girls, and to Miss Eyre, should be considered as 'gifts'. In the case of the 3 girls it might be simple enough to claim that they were sharing in their father's estate, that is, for Gertrude and Alice; and, with a little stretching, that might apply to Charlotte also.

"In Miss Eyre's case, too, there must be a way. It is ridiculous, of course, that either she or I should be taxed on her allowance. The whole thing is so outrageous any way. I feel too bitterly to make comments, even! It's the death duties and inheritance taxes that are going to play the devil for one's heirs. And all for what? To pay out billions of dollars to people without the ability or the energy or the thrift to make any money for themselves, and who mostly have done nothing to build up or develop the country—whereas the men & women who have done all of that are going to be stripped bare! Isn't that true?

"My love to Carry—and always for yourself.

"Affectionately—Gertrude—"

The "allowances" to her three girls mentioned in the foregoing letter refer to the monthly payments directed by the decedent to be made from the 1931 revocable trust hereinabove referred to.

As plaintiff points out, the forebodings expressed by the decedent concerning taxes on her "allowances to my three girls" and to Miss Eyre, were largely figments of her ignorance of the revenue laws since, as a matter of fact, at that time the specific exemption for each annual gift was $5,000; thus her allowances to Charlotte and Miss Eyre were en-

tirely exempt, and only $3,200 totally of the allowances to the other two daughters were taxable. Under the "new" law she mentioned, she was in fact required to pay no tax on this overcharge of $3,200 until the aggregate of such accumulated amounts reached the $40,000 specific exemption provided in the new law.

However, there can be no question, as the Government stresses, that the decedent did have in mind estate taxes when she wrote: "It's the death duties and inheritance taxes that are going to play the devil for one's heirs."

In due course, Mr. Berger referred the foregoing letter, to which I shall refer hereinafter as Government's Exhibit 3, to Mr. McLean, Trust Officer of the Colorado National Bank, for his suggestions, which were duly made in the form of a letter addressed to the decedent and dated October 4, 1935. Mr. McLean began this letter by assuring decedent that she need not be much concerned about gift taxes under her existing program of giving and said that the income tax was not a serious matter since such a large proportion of her holdings were in tax-exempt securities. He then pointed out that the heaviest incidence of the new taxes would be in the way of estate taxes and suggested that the creation of an irrevocable trust before the end of 1935 would be advantageous taxwise and then proceeded to give a concrete example of such an arrangement on an assumed net estate of one million dollars, to be distributed equally among three children. On October 5, 1935, Mr. Berger mailed to decedent the last-mentioned letter written by Mr. McLean. In his cover letter, Mr. Berger suggested that the decedent should return to the United States and consult about the matter with her attorney, Charles B. Hill, who resided in New York City, New York, and recommended prompt consideration, mentioning that a substantial increase in the gift tax would become effective on January 1, 1936.

That the idea of an irrevocable trust was not entirely new to decedent appears from the undisputed evidence that at various times during the years 1933, 1934 and 1935, Mr. John E. Tuilman, of Dedham, Massachusetts, the Vice-President of the First National Bank of Boston, who was the financial adviser of Gertrude Wheelwright, discussed with decedent the rather involved finances of the Wheelwright family arising from certain unprofitable investments made by Mrs. Wheelwright, coupled with the inability of her husband and herself to live within their income. In the course of these discussions Mr. Tuilman suggested that Mrs. Cuthbert create irrevocable trusts for her daughters, particularly Mrs. Wheelwright, to insure sufficient money to maintain the latter at the standard of living she had chosen for her family and to insure the permanency of such income. The decedent promised to discuss the matter with her lawyer. It also appears that during these years the decedent was very much concerned with the finances of her daughter Alice, who also had demonstrated some inability to cope with the financial problems of her family and herself.

It further appears from the evidence that her attorney, Mr. Hill, had handled decedent's legal affairs from the time of Mr. Cuthbert's death in 1915 until her passing and that the decedent on many occasions had conferred with him about the financial problems of her children, particularly between the years 1925 and 1935. She also had brought to Mr. Hill's attention the suggestions of Mr. Tuilman, Mr. Berger and Mr. McLean.

Following the receipt of Mr. Berger's letter of October 5, 1935, the decedent returned to the United States and on November 16 of that year, a conference was held in Mr. Hill's office with Mr. Hill, Mr. Peck, one of his law partners, Mr. McLean and the decedent present, at which time the instruments creating the three irrevocable trusts here in concern, were executed, one for each of the three daughters, in each of which $200,000 in securities was placed. The Colorado National Bank and George B. Berger were named as Trustees. The terms of the trust agreements provided that the income

from each trust was to be paid to the respective daughter named as beneficiary and upon the death of the beneficiary the corpus was to be divided according to the provisions of the last will and testament of the beneficiary, or in default thereof in accordance with the intestate laws of Colorado. The three trusts were irrevocable and decedent divested herself of all incidents of ownership or control of their assets. Thereunder the daughters were to receive approximately what they had been receiving under the 1931 trust by way of income.

Gift taxes were duly returned and paid on the full value of the property embraced in the trusts.

It is conceded that unless construed as being transfers made in contemplation of death, the inter vivos 1935 trust would not be includable in the gross estate of the decedent for the purpose of computing the estate tax applicable thereto.

Mr. McLean and, of course the decedent, both passed away before the date of the trial herein and of those present at such conference Mr. Hill alone, by deposition, gave testimony as to what there occurred. He stated that the effect of the trusts with respect to income, gift and estate taxes was explained to decedent. Concerning this subject, as testified to by Mr. Hill, decedent mentioned she was anxious to get the matter concluded before the increase in gift tax rates went into effect, but said "very little, if anything, about estate taxes." He further stated that he did not recall that the two comparisons contained in the McLean letter hereinabove mentioned were discussed, and continued, "I do know that they were not emphasized to any extent if they were discussed and they played little or no part in my advice to her to create the trust and in her action in doing so. There was as little discussion of taxes as in the creation of any trust of which I have had a part."

He further testified that the decedent's purpose was expressed in a letter drafted by himself for the decedent's signature, addressed to George V. Berger and the Colorado National Bank, dated November 21, 1935, which reads in part:

"This [the 1931 revocable trust] does not, from the standpoint of my daughters' needs, have any aspect of permanence or dependability. Each of them, to maintain herself and her family in comfort and to be enabled to live the sort of free and enjoyable life I crave for them, will need, permanently, something more by way of current income than she is now receiving. From my own point of view, also, I have become desirous of lessening the burden on myself of the final investment responsibility for my entire estate, which now rests upon me under the terms of the trust agreement. I am away from Denver so much of the time, and so often abroad, that in these changing times it is very difficult for me to keep at all closely in touch with investment conditions, and I feel quite inadequate, under the circumstances, to carry on any longer with these present responsibilities."

On the same day, concerning the new arrangement the decedent, in her own hand, wrote to her daughter Charlotte B. Barbour, saying in part:

"I want to explain to you what I have done about your monthly allowance which for many years you have been getting regularly. I am making the same arrangement for Gertrude and for Alice. As I live in the U. S. A. so little of the time I feel I am growing out of touch with business conditions. The burden of responsibility in the matter of investments and the giving of advice and making decisions from a long distance, is growing too onerous.

"So, I decided to return to America, for a short time, to re-arrange the administration of my estate, which I have succeeded in doing.

"I have set aside a certain sum and placed it in trust, the same amount for each of my three daughters. The trusts are fixed and irrev-

ocable. The principal allotted to each of you is assumed to be sufficient to provide a monthly income equal to that which I have given you for many years out of my own resources.

"In this way, you will see, the burden of responsibility on my shoulders will be considerably eased. I have complete confidence in the trustees who will hereafter manage the trust funds, in each of your cases.

"I hope I have made it quite clear. There really was not much to explain. You will all receive the same monthly allowances, but from your trust funds, as I fade out of the picture! We will soon meet again at our 'Thanksgiving' family reunion in Lincoln."

Following the execution of the 1935 trusts and on the same day, the decedent executed a new will which, with the addition of two codicils of minor importance, constituted her last will and testament. Under the will decedent divided her estate into three parts: one part was bequeathed outright to Charlotte Berger Barbour, and the other two parts were bequeathed in equal proportions in trusts to her other two daughters with George Berger of the Colorado National Bank.

The decedent departed this life on December 16, 1944, nine years and one month after the creation of the trusts in question. The Government thus is without the benefit of the rebuttable presumption that these trusts were made in contemplation of death which under the applicable statute would have attained in the event the transfers had been made within two years prior to the decedent's death.

Although without direct bearing here, I believe it worthy of mention in passing to note that under the present policy as promulgated by the Congress in 1950, Title 26, section 811(*l*) and continued in the Internal Revenue Code of 1954, section 2035, 26 U.S.C.A., the transfers here in consideration, not having been made before the three-year period preceding the

death, in no event could be treated as having been made in contemplation of death.

When the trusts in concern were created the decedent was sixty-six years of age. Her health at that time was variously characterized by the evidence as being "splendid," "in the picture of health" and "excellent." She suffered no illness until following her return from Germany in 1939, four years after the creation of the 1935 trusts, when she complained of arthritis of the knees. Upon submitting to an examination by her physician, it was discovered for the first time that she was suffering from a malignant condition in her breasts. Operative procedures were resorted to following which her health declined until the time of her passing in 1944, at the age of seventy-five. Considering the foregoing circumstances, it would seem evident that the decedent did not set up the 1935 trusts in the contemplation that death was near at hand.

In effect, the Government concedes as much, but contends that the transfers in question nevertheless were made "in contemplation of death" within the meaning of the statute as it has been interpreted by the courts upon the basis that under the evidence the dominant and impelling motive of the decedent in creating the 1935 trusts was the avoidance of Federal estate taxes.

The applicable law is well epitomized in the opinion of the Supreme Court, in Allen v. Trust Company of Georgia, 326 U. S. 630, 635, 66 S.Ct. 389, 391, 90 L.Ed. 367, wherein Justice Douglas wrote:

"It was said in United States v. Wells, 283 U.S. 102, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867, that a gift is made in contemplation of death within the meaning of the estate tax law if 'the motive which induces' it is 'of the sort which leads to testamentary disposition.' Petitioner's argument is that a purpose to avoid the estate tax is such a motive. It is a motive which would cause a decedent to make an *inter vivos* transfer rather than a will. Since the purpose of the contemplation of death provision

was to reach substitutes for testamentary dispositions in order to prevent evasions of the tax (United States v. Wells, supra, 283 U.S. at pages 116–117, 51 S.Ct. at page 451), the statute is satisfied, it is said, where for any reason the decedent becomes concerned about what will happen to his property at his death and as a result takes action to control or in some manner affect its devolution.

"That is a correct statement of the governing principle for it presumes the existence of the requisite motive. The transfer is made in contemplation of death if the thought of death is the 'impelling cause of the transfer.' City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 599, 65 S.Ct. 496, 498 [89 L.Ed. 483]. The transfer may be so motivated, even though the decedent had no idea that he was about to die. United States v. Wells, supra, 283 U.S. at pages 117–118, 51 S.Ct. at pages 451, 452, 75 L.Ed. 867. On the other hand, every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense. Many gifts, even to those who are the natural and appropriate objects of the donor's bounty, are motivated by 'purposes associated with life, rather than with the distribution of property in anticipation of death.' United States v. Wells, supra, 283 U.S. at page 118, 51 S.Ct. at page 452. Those motives cover a wide range. See 1 Paul, Federal Estate & Gift Taxation (1942) §§ 6.09 et seq. 'There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death.' United States v. Wells, supra, 283 U.S. at page 119, 51 S.Ct. at page 452. Whether such a desire was the dominant, controlling or impelling motive is a question of fact in each case."

As the genesis of the argument in support of its contention the Government points to the decedent's words, "It's the death duties and inheritance taxes that are going to play the devil for one's heirs," contained in her hereinabove-quoted letter, Government's Exhibit 3, to Mr. George Berger. While this expression unquestionably does refer to estate taxes, I do not believe it can be said, as the Government next asserts in its brief, that the sentence in this letter reading, "In some way it *must* be circumvented" refers to estate taxes at all; rather, considering the context, the reference patently was directed to gift taxes on the "allowance" to her "three daughters and Miss Eyre."

The Government further argues that the letter, Government's Exhibit 3, must be taken as being a "demand" that Mr. Berger or the bank furnish decedent with a Federal estate tax avoidance plan. Such, it is said by the Government, was supplied by the letter of Mr. McLean, Trust Officer of the bank, dated October 4, 1935, as supplemented by Mr. Berger's letter written the next day, both of which have been mentioned hereinabove in some detail.

It is next pointed out that the decedent rather promptly returned to the United States and conferred with her attorney, as suggested by Mr. Berger, and that at this conference the 1935 trust agreements were executed, in the pattern, so the Government contends, of the plan proposed by Mr. McLean.

The Government argues that from these circumstances it must be inferred that the decedent's dominant motive in creating the 1935 trusts was avoidance of the Federal estate taxes. In considering the weight to be accorded these inferences, it should be recalled, as hereinabove mentioned, that the only direct testimony as to what happened at the conference at which the trusts were executed, was to the effect that the letters of Mr. McLean and Mr. Berger were given little, if any, attention.

The Government further contends that death motive is further imported by the following testimony of Mrs. Barbour, one of decedent's daughters (Transcript 65–66):

"Q. Did she [decedent] give you any reasons for creating the trusts? A. She gave me the reason that she was—well, almost fanatically anxious to be free. She didn't like to be worried and bothered with family affairs. She liked to be able to go at any time anywhere she wanted and stay as long as she liked without the necessity of our corresponding with her to give her any bad news or anything like that. She liked to be in those years completely free.

"That was one reason.

"The other was that * * *

"That she would like to provide for us, that she was doing this because it would make it better for us later on, were her words."

It is argued that the expression, "It would make it better for us later on," must be taken as referring to the saving in Federal estate taxes which "would make it better" for the daughters when their mother died.

It also is said that the circumstance that the decedent made a new will coincident with the execution of the trust that the whole transaction is thereby given a testamentary aspect.

Clearly, it seems to me, it was decedent's concern, even though to some extent unfounded, over the enactment of the "new" gift tax law rather than any estate tax situation which put in motion the chain of events last detailed upon which the Government rests its case. Decedent's letter of August 23, 1935, to Mr. Berger, as read by me, clearly so indicates. Her above-mentioned reference therein to estate taxes, it seems to me, was made by way of observation rather than as a declaration of any intent of evasion. Her return to the United States for a conference with counsel, as suggested by Mr. Berger on October 5, 1935, as well as the actual execution of the trust agreements on the following November 16 of that year, obviously were influenced by the circumstance that under the "new" gift tax law, gift taxes would be increased on January 1, 1936.

It also is undisputed that before the 1935 trust papers were executed, the estate tax result of the arrangement was explained to the decedent.

While it thus can not well be questioned that the tax situation played a part in the making of the 1935 irrevocable trusts, nevertheless, in my opinion, in determining the dominant motive of the decedent impelling their creation, the less-than-three-months' period nine years before her death in which the occurrences last enumerated transpired may not be isolated, as the Government would do, from the pattern of decedent's financial program with respect to her daughters for the preceding two score years or more.

All of the money spent for the maintenance and education of the girls prior to their marriage, and every allowance sent to them thereafter to 1935, was a separate gift from the decedent. It would seem there can be no doubt about her motives for all of these gifts. She was taking care of her children and enabling them to live on a certain standard, despite their own ill-considered financial ventures and the inadequate income of their spouses to support them and their families at that level. The 1931 revocable trust, while reserving a life estate in the income to the decedent, provided through her written directions a more effective vehicle for carrying out her previously-established plan to the end that her daughters would continue during her lifetime to have help and aid from their mother month by month on a firm basis without reference to where she might be. Upon her death the corpus and accumulated income of the trust would pass to them or their children as her heirs. Thus, for the period prior to 1935 the undisputed evidence portrays an unbroken record of gifts and her desire to continue the same for the constant benefit of her children during her lifetime as well as thereafter.

By the 1935 irrevocable trusts she placed a substantial part of her assets beyond any further control on her part; otherwise, what she did was to continue without much change what she previously had done through the revocable trust of 1931 and through the even more informal trusteeship extant previous to that date.

Naturally and properly, before the latter step was taken the consequences of the new trusts as to income, gift and estate taxes were explained to decedent by her consultants. Such, I believe, may be assumed would be the normal procedure attendant to the formation of an irrevocable trust of this size by anyone and at any time. Even so, according to the positive evidence, there was in this one as little discussion of taxes as in the creation of any trust in which the witness Mr. Hill, a lawyer of wide experience, had ever had a part.

■ "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 267, 79 L.Ed. 596.

■ To uphold the position of the Government herein would require a finding that the decedent's dominant motive in creating the 1935 trusts was for the purpose of avoiding estate taxes and that the thought of death was the impelling cause of these transfers.

This, in my opinion, properly may not be done when all the evidence is considered; rather, I am convinced that the plaintiff has met the burden of showing that the 1935 trusts were dominantly motivated by "purposes associated with life rather than with the distribution of property in anticipation of death." United States v. Wells, 283 U.S. 102, 118, 51 S.Ct. 446, 452, 75 L.Ed. 867. Further employing the words of the opinion therein, 283 U.S. at page 119, 51 S.Ct. at page 452, I am satisfied from the evidence that the 1935 trusts had their origin in the desire of the decedent "to recognize special needs or exigencies" and "to discharge moral obligations" and that "the

gratification of such desires" was "a more compelling motive than any thought of death."

It, therefore, must be held that the 1935 irrevocable trusts were not created or made in contemplation of death in the statutory sense, or at all, and that plaintiff is entitled to its recovery.

I believe this disposition is particularly supported by the decision of the Supreme Court in Allen v. Trust Co. of Georgia, supra, in which the facts, while not parallel, have some analogy to those of the case at bar. Such is made to appear further from the opinion of the Fifth Circuit Court of Appeals in the same case, reported in 149 F.2d 120.

Well stating the principles applicable here as I understand them, is the following excerpt from the opinion in Bell v. United States, D.C., 74 F.Supp. 295, 305:

"Acts of the settlor indicating a desire to follow a plan during his life in sharing his wealth with others so that there may be present enjoyment of it, is evidence of contemplation of life and not of death. A desire to make children or other members of the family financially independent is associated with life and not with death. A taxpayer properly may reduce his income tax by gifts from his estate."

The decision of the Tenth Circuit Court of Appeals, in Davidson's Estate v. Commissioner, 158 F.2d 239, 243, strongly relied upon by the Government, is clearly distinguishable from the case at bar by reason of the difference in the facts attending. Such is made to appear from the opinion in the Davidson case where the Court said:

"It is necessary to consider the trust and the will together in order to determine the beneficiaries of the residuary estate."

The Tax Court (4 Tax Court Memorandum Decisions), moreover, said at page 976:

"The will and the trust represent a complete plan of the decedent for the disposition of her estate upon death. The will specifically refers to the

trust instrument and as to residuary estate would be incomplete and indefinite without it; for the provisions of the trust must be read to ascertain the beneficiaries of her residuary estate. * * *"

Obviously, no similar situation exists in the case at bar. Insofar as I know, it has never been held that the making of a will at the same time an inter vivos gift is made, has any particular significance where the making of the gift is dominantly impelled by purposes associated with life, and not death, as is the situation here.

The matter of attorneys' fees will be disposed of pursuant to the stipulation of the parties made at the conclusion of the trial.

Accordingly, it is ordered that counsel for plaintiff within thirty days prepare and submit findings of fact and conclusions of law consistent with this memorandum opinion, together with an appropriate form of judgment, all of which shall be settled by notice if not stipulated to as to form.