Estate of Hilda M. Lenna, Deceased, Harry A. Lenna, Reginald A. Lenna and Helen L. Milham, Executors v. Commissioner.
Estate of Lenna v. Commissioner
Docket No. 65566.
United States Tax Court
T.C. Memo 1960-153; 1960 Tax Ct. Memo LEXIS 135; 19 T.C.M. (CCH) 803; T.C.M. (RIA) 60153; July 18, 1960
*135 Held, transfers of certain property made by the decedent, within three years of her death, in establishing separate and irrevocable trusts in favor of her three children were not made in contemplation of death and are not includible in her gross estate under section 2035(a) and (b), Internal Revenue Code of 1954. J. Russell Rogerson, Esq., Miles L. Lasser, *136 Esq., and S. J. Lasser, C.P.A., for petitioner. John J. O'Toole, Esq., for respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: This proceeding involves a deficiency in Federal estate tax in the amount of $41,285.03 determined against the Estate of Hilda M. Lenna. The issues for our decision are: (1) Whether certain transfers of property by the decedent on January 2, 1953, within three years of her death, are includible in her gross estate under section 2035(a) and (b), Internal Revenue Code of 1954, as transfers made in contemplation of death; and (2) Whether additional administration expenses arising from this controversy are deductible from decedent's gross estate. Findings of Fact Hilda M. Lenna (hereinafter referred to as the decedent), a resident of Jamestown, New York, died on October 18, 1954, at the age of 72. Decedent's Federal estate tax return was filed on January 16, 1956, with the district director of internal revenue, Buffalo, New York. Decedent was the widow of Oscar A. Lenna, who died on January 25, 1951. Oscar A. Lenna had migrated from Sweden to the United States at the age of 17. In 1914, with an $18,000 loan, he started *137 a business handling car parts in Jamestown, New York. He served as president of this corporation until his death. In 1944 this corporation acquired the assets of the Blackstone Corporation, and in 1947 changed its name to Blackstone Corporation (hereinafter, both Blackstone Corporation and its Lenna-controlled predecessors will be referred to as Blackstone). As of January 1953 Blackstone was engaged in the manufacture of automobile radiators, heaters, and household appliances. As of the date of trial said corporation had assets in the amount of $19,000,000. Since the time of its founding Blackstone has been a Lenna family enterprise. At one time, Oscar A. Lenna apparently owned a majority of its outstanding stock. For all practical purposes the Lenna family controlled Blackstone's voting stock. The stock not held by the Lennas was held by employees of the corporation. The Lennas had three children: Harry A. Lenna, Reginald A. Lenna, and Helen Lenna Milham. Harry A. Lenna has been secretary and treasurer of Blackstone since 1936. Reginald A. Lenna has been president of Blackstone since his father's death in 1951. Helen Lenna Milham has not been an active participant in the affairs *138 of Blackstone. In 1936 Oscar A. Lenna made a gift of 500 shares of Blackstone to the decedent with the express desire that these shares be given to their children when decedent had no further use for them. In 1946 Oscar A. Lenna established three inter vivos trusts, one for each of his three children. Each trust consisted of 1,000 shares of Blackstone stock. The three children were appointed trustees of each of the trusts. Under the terms of the trusts the beneficiaries were to receive the income for life with remainder over to the children of the respective beneficiaries. On January 2, 1953, decedent established three separate identical trusts for the benefit of her three children. The three children were appointed as trustees of each of the three trusts. To the corpus of each trust decedent transferred a portion of the 500 shares of Blackstone which she had received from her husband in 1936, 167 shares each to two of the trusts and 166 shares to the third trust. To each trust decedent also transferred a one-third interest in the Lenna family residence which was located in Jamestown, New York. The trusts provided that the beneficiaries were to receive income for life with remainders *139 over to their respective children. Decedent expressly waived "all right and power to amend, modify or revoke * * * in whole or in part." On January 30, 1953, decedent executed her will. This will provided for three identical trusts for the benefit of her three children. The corpus of each of these trusts consisted of a one-third interest in the residue of decedent's estate. Discussions between the decedent and J. Russell Rogerson, the Lenna family attorney, concerning both the will and the three inter vivos trusts commenced some time during 1952. Both the will and the trust instruments were prepared at or about the same time. Decedent at first wanted to transfer the 500 shares of Blackstone to the inter vivos trusts established by her husband in 1946, but when her attorney advised the decedent that such disposition was impossible, trusts resembling her husband's trusts were established. The provisions, terms, and beneficiaries of the inter vivos trusts established by decedent's husband in 1946 and by decedent in January 1953, and of the testamentary trusts established under decedent's will were substantially identical. After the death of Oscar A. Lenna decedent derived income *140 from the following sources: a trust established in decedent's favor under his will, certain insurance policies, social security payments, and dividends on the 500 shares of Blackstone stock. This income was more than ample for decedent's frugal standard of living. In fact she had $80,928 in a bank account when she died. After her husband's death decedent placed the Lenna family residence on sale, but lived there alone until August 1952. The Lenna family residence was a large brick house on Van Buren Street in Jamestown, New York. It had five rooms on the main floor, four bedrooms and three baths on the second floor, a bedroom and bath on the third floor, and a playroom and laundry in the basement. Decedent maintained the house and did all the housework herself with the aid of a cleaning woman who came in one day a week. Decedent considered the house too large, lonely, and expensive and moved to a small nearby apartment in August 1952. After she moved out the house was vacant and, unable to sell it, she transferred the house to the inter vivos trusts which she established on January 2, 1953, merely to get rid of it. Decedent's health in January 1953 and throughout the years prior *141 to her death was excellent. She was a small, wiry, cheerful person who liked hard physical activity. She did all her own housework, with the exception of having the cleaning woman once a week, while she lived in the Lenna family residence. Decedent's visits to her doctor were infrequent and only for relatively minor complaints. Decedent died of a coronary thrombosis on October 18, 1954. Her death was sudden, unexpected, and without any prior indication of heart trouble. Decedent's dominant motive in transferring the 500 shares of Blackstone, in creating the three inter vivos trusts on January 2, 1953, was to conform with her husband's desire that she give the shares to their children when she no longer had any need for them. Decedent's transfers of January 2, 1953, in creating the three inter vivos trusts in favor of her three children were not made in contemplation of death. Opinion Respondent has determined that decedent's transfers on January 2, 1953, approximately 21 months before her death, of 500 shares of Blackstone stock and the Lenna family residence in creating irrevocable trusts for the benefit of her three children were made in contemplation of death and are therefore *142 includible in her gross estate under section 2035(a) and (b), Internal Revenue Code of 1954. [1]
*143 We do not agree with respondent's determination. It is well established that in order to bring a transfer within the ambit of the "contemplation of death" provisions, the thought of death must be the dominant, controlling, or impelling motive for the transfer. "* * * the motive which induces the transfer must be of the sort which leads to testamentary dispositions." United States v. Wells, 283 U.S. 102, 117 (1930), accord Allen v. Trust Co., 326 U.S. 630 (1946). In our view the dominant motive actuating decedent's transfers was associated with decedent's desire to accomplish living purposes rather than with any consideration or anticipation of death. The record clearly established that at the time the transfers were made and throughout the pertinent period decedent's health, both physical and mental, was excellent and that she had no special concern or apprehension of death. Decedent's infrequent visits to her doctor were for relatively minor and insignificant temporary illnesses. Her death of a coronary thrombosis was sudden and unexpected and without any previous indication of heart trouble. The respondent preliminarily contends, however, that "The *144 deceased, even though not in apparent poor health, did have an awareness of death because of the recent death of her spouse." This contention is without merit. While the death of a spouse or close relative shortly prior to a questioned transfer may be considered affirmative evidence of a death motive, see Commercial National Bank, 36 B.T.A. 239, such circumstance must be viewed in light of the entire record and may be outweighed by other factors indicating a living motive. See Estate of Bertha Low, 2 T.C. 1114, affd. 145 F. 2d 832 (C.A. 2, 1944). Here decedent was in excellent health, there was a 2-year lapse between the death of the spouse and the questioned transfers, and the testimony indicates that decedent accepted her husband's death calmly and adjusted to it readily. In view of these factors and more especially because of the presence of a dominant living motive, a testamentary purpose cannot be inferred from the prior death of decedent's husband. In support of his position that the trust transfers were substitutes for testamentary dispositions respondent relies almost entirely on the contemporaneous preparation and execution of the *145 three inter vivos trusts and decedent's will and on the fact that the terms and beneficiaries of the three inter vivos trusts and those of the testamentary trusts established by decedent's will were substantially identical. The proximity of time in the preparation and execution of the will and trust instruments and the similarity of their terms and beneficiaries must be considered in light of the entire record. Where the questioned transfers occur at or about the time of the donor's will, a death motive might be inferable, but only in the absence of dominant and impelling life motives. See Estate of Harry E. Byram, 9 T.C. 1; Estate of Augusta D. Moyse Schmucker, 10 T.C. 1209. Cf. Colorado National Bank of Denver v. Nicholas, 127 F.Supp. 498 (D. Colo., 1954). Here such dominant life motives were present and they served as the catalyst for decedent's transfers. Certainly the mere similarity of inter vivos and testamentary dispositions to identical beneficiaries does not necessarily suffice to establish a plan of testamentary disposition, since donors quite frequently bestow their bounty on the natural objects thereof. See Estate of Emma L. Keck, 10 T.C. 1121. *146 Furthermore, the similarity of terminology in the respective instruments may be as much a matter of draftsmanship convenience as an indicator of testamentary purpose. In fact, the testimony indicates that decedent at first sought to place the 500 shares of Blackstone into the trusts established by her husband, but when advised this was impossible she established separate trusts resembling her husband's trusts. The controlling factor in the disposition of this case centers on the existence of a dominant and impelling life motive, rather than on inferences which might be drawn from any connection between the will and trust instruments. The 500 shares of Blackstone stock which were the subject of the questioned trust transfers were originally given to the decedent by her husband with the expressed desire that the shares be given to their children when decedent had no further use for them. After her husband's death the decedent, by nature a very frugal person, had ample income from other sources, had no further need for the 500 shares of Blackstone stock and therefore transferred them to the trusts in favor of her children, primarily for the reason that she wanted to conform with her *147 husband's wishes. Furthermore, the record also indicates that her husband had often expressed the wish that the Lenna family holdings of Blackstone stock would continue in the family. He himself had transferred a substantial number of Blackstone shares to his children under the 1946 trusts. Thus, the retention of family control was also part and parcel of the motivating force behind decedent's transfers. Decedent's desire to carry out these desires, preferences, and requests of her deceased spouse constitutes a moral obligation, the fulfillment or discharge of which is equivalent to a living purpose. See Estate of Emma L. Keck, supra. See also United States v. Wells, supra, 119, where the Supreme Court stated: "There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death." In our view, decedent's desire to fulfill her husband's wishes was the dominant and compelling motive and accordingly the 500 shares of Blackstone stock are not includible in decedent's gross estate. Decedent's inter vivos disposition of the Lenna family *148 residence to the three trusts in favor of her children was likewise prompted by life motives. The record indicates that even during her husband's life she considered the house too large and unwieldy. After her husband's death she placed the house for sale, lived in it for a while, found it too lonesome and too troublesome, and therefore moved into a small nearby apartment. Unable to sell it and concerned with the upkeep and expense of such a large vacant place, she transferred it to the trusts, at the suggestion of her attorney, merely to get rid of it. Such a disposal of property with which the donor is dissatisfied does not impress us as being a substitute for a testamentary disposition. Accordingly, the Lenna family residence was not transferred in contemplation of death and is not includible in decedent's gross estate. Petitioner, in its petition and on brief, also claims an overpayment, contending that the additional legal, accounting, and other administration expenses incurred in connection with this controversy and not claimed upon the decedent's estate tax return are deductible from decedent's gross estate. Under Rule 50, Tax Court Rules of Practice, the parties may agree *149 as to such additional expenses. If they are unable to so agree petitioner may, under Rule 51, [2] move to reopen the case for further trial on this issue. See Estate of Harry A. Ellis, 26 T.C. 694, revd. on other grounds 252 F. 2d 109 (C.A. 3, 1958). Accordingly, Decision will be entered under Rule 50. Footnotes
1. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
2. RULE 51. ESTATE TAX DEDUCTION DEVELOPING AFTER TRIAL. If the parties in an estate tax case are unable to agree under Rule 50↩, or under a remand, upon a deduction involving expenses incurred at or after the trial, the petitioner may move to reopen the case for further trial on that issue provided it is raised in the petition or by amendment thereto.